IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES FOR THE USE
AND BENEFIT OF NORTHWEST
CASCADE INC., a Washington
Corporation as assignee of
DEWITT CONSTRUCTION, INC.,
a Washington Corporation,

       Plaintiff,

   v.

COLAMETTE CONSTRUCTION
COMPANY, an Oregon
Corporation, and SAFECO
INSURANCE COMPANY OF
AMERICA, a New Hampshire
Corporation,

       Defendants.

Case No. 3:13-cv-01498-AA
OPINION AND ORDER

---

Michael P. Grace
Michael J. Murphy
Meredith L. Thielbahr
Groff Murphy, PLLC
300 E. Pine Street
Seattle, Washington 98122
    Attorneys for plaintiff

D. Gary Christensen
Michael O. Mohr
Miller Nash LLP
111 S.W. Fifth Avenue, Suite 3400
Portland, Oregon 97204
    Attorneys for defendants

Page 1 - OPINION AND ORDER

AIKEN, Chief Judge:

Pursuant to Fed. R. Civ. P. 56(a), defendants Colamette Construction Company ("Colamette") and Safeco Insurance Company ("Safeco") move for summary judgment on plaintiff the United States for the Use and Benefit of Northwest Cascade Inc.'s ("NWC") claims.[1] For the reasons set forth below, defendants' motion is granted and this case is dismissed.

## BACKGROUND

On September 29, 2010, after a competitive bidding process, the Department of Veterans Affairs ("VA") selected Colamette as prime contractor for a new parking structure at a Federal facility ("Project"). On October 1, 2010, Colamette obtained a Miller Act payment bond with Safeco, in the amount of $7,313,371, as required under its contract with the VA ("Bond"). On April 7, 2011, Colamette subcontracted with DeWitt Construction, Inc. ("DeWitt") to furnish the labor, materials, and equipment necessary to drill shafts and install nail shoring for the Project's ground support system. DeWitt subsequently hired NWC, pursuant to a second-tier subcontractor agreement, to construct and install the Project's soil nail wall.

Once construction commenced, the parties discovered that the Project's site conditions differed from the VA's geotechnical

---

[1] Where, as here, a civil lawsuit is commenced under the Miller Act, it must be brought "in the name of the United States for the use of the person bringing the action." 40 U.S.C. § 3133(b)(3)(A).

report on which Colamette based its bid. Significantly, the site contained softer soils, requiring Colamette to change its design for the Project from a soil nail wall support system to a soldier pile wall support system. On August 29, 2011, Colamette began meeting with the VA to discuss design changes and upward adjustments to the prime contract price. The parties' negotiations were based, in part, on information regarding cost increases provided by Colamette's subcontractors. In other words, Colamette was relying on DeWitt to contribute complete cost-increase information for itself and NWC. Colamette repeatedly informed DeWitt and NWC that they would need to provide detailed documentation and support for any increased costs associated with design changes in accordance with particular format and deadlines provided by the VA.

On December 15, 2011, NWC presented two pricing proposals, the first pertaining to the installation of permanent tiebacks ("Installation Costs") and the second relating to an equitable adjustment for differing soil conditions ("Impact Costs"). On December 19, 2011, the VA's initial deadline, Colamette accepted NWC's Installation Costs but rejected the Impact Costs because NWC did not provide sufficient detail or credits for materials/labor that were deleted from the scope of work. On December 29, 2011, NWC furnished a revised proposal regarding its Impact Costs. On March 2, 2012, Colamette sent NWC a letter explaining that the December 29, 2011, revised Impact Costs were denied because they were

Page 3 - OPINION AND ORDER

relayed too late and in an improper format.

On April 30, 2012, Colamette gave DeWitt and NWC a second chance to adequately support any delay or impact damages before furnishing a certified claim against the VA. Colamette therefore solicited "a new complete claim which will need to include everything . . . the same type of information as the original one and include any new ones." Hirte Decl. Ex. 5, at 1. Colamette expressly cautioned NWC that information for its late-filed Impact Costs must be resubmitted in order to be part of the agreed-upon settlement with the VA. DeWitt did not include any new documentation concerning NWC's Impact Costs in its adjusted calculations; however, NWC sent an amended request concerning its Installation Costs, which were included in Colamette's certified claim to the VA. Ultimately, the VA settled with Colamette for $2,027,174, an amount equal to approximately 91% of the initial total contract adjustment.

On May 4, 2012, DeWitt accepted a change order from Colamette for the redesign work associated with the Project's differing site conditions. The total contract price that Colamette agreed to pay DeWitt was adjusted upward by $998,461.62. On May 16, 2012, DeWitt executed a corresponding change order to NWC for the new tieback work in the sum of $382,335.39.

On August 29, 2012, NWC finished its portion of the Project. On January 8, 2013, DeWitt completed all required Project work. On January 24, 2013, DeWitt filed a $585,364.70 claim under the Miller

Page 4 - OPINION AND ORDER

Act with defendants against the Bond. On August 2, 2013, DeWitt submitted an amended notice regarding its Bond claim, requesting $372,163.48 and indicating for the first time that its claim was premised on the unpaid work of its subcontractors. On August 22, 2013, DeWitt and NWC executed a Memorandum of Understanding, which assigned NWC the exclusive rights to any monies received by DeWitt from defendants for Project work performed by NWC.

On August 26, 2013, NWC filed a complaint in this Court, alleging claims for: (1) Bond payment under the Miller Act; (2) quantum meruit; and (3) breach of contract. NWC seeks judgment against defendants in the amount of $372,163.48, plus costs, attorney fees, and prejudgment interest, for unpaid work performed on the Project. In February 2014, DeWitt and NWC entered into a Restated Memorandum of Understanding ("RMOU"), pursuant to which Dewitt purported to grant NWC an Article 9 Uniform Commercial Code ("UCC") security interest in any sums collected by DeWitt from defendants. On July 14, 2014, defendants filed the present motion for summary judgment.

**STANDARD**

Summary judgment is appropriate if the pleadings, depositions, affidavits, answers to interrogatories, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the

materiality of a fact. T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of a dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts that demonstrate a genuine issue for trial. Id. at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. T.W. Elec., 809 F.2d at 630.

## DISCUSSION

Defendants argue that summary judgment is warranted because NWC did not independently furnish notice, timely or otherwise, of its Bond claim in accordance with the Miller Act. Defendants also assert that where, as here, a valid contract exists, allegations concerning quantum meruit are not cognizable. Moreover, defendants contend that DeWitt never effectuated a valid assignment to NWC

but, even assuming that it did, DeWitt waived its right to further payments for work performed through October 31, 2012.

NWC opposes defendants' motion because "NWC can stand in the shoes of DeWitt on its Miller Act Bond Claim" or, in the alternative, "recover against Colamette under quantum meruit." Pl.'s Resp. to Mot. Summ. J. 9-12. In addition, NWC argues that the RMOU "created an effective Article 9 security interest to NWC in all money due from Colamette and Safeco." Id. at 14. According to NWC, the progress payment waivers do "not limit [its] claim for [I]mpact [C]osts" because they included "pro tanto language." Id. at 17.

I.   Miller Act Claim

The Miller Act creates a cause of action for "[e]very person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131 of this title and that has not been paid in full." 40 U.S.C. § 3133(b)(1). It "represents a congressional effort to protect persons supplying labor and material for the construction of federal public buildings in lieu of the protections they might receive under state statutes with respect to the construction of nonfederal buildings." Ramona Equip. Rental, Inc. ex rel. U.S. v. Carolina Cas. Ins. Co., 755 F.3d 1063, 1067 (9th Cir. 2014) (citation and internal quotations omitted).

The Miller Act requires "[a] person having a direct

Page 7 - OPINION AND ORDER

contractual relationship with a subcontractor but no contractual relationship, express or implied, with the contractor" to furnish notice of a claim against the bond "within 90 days from the date on which the person did or performed the last of the labor or furnished or supplied the last of the material for which the claim is made." 40 U.S.C. § 3133(b)(2). "This notice requirement serves an important purpose: it establishes a firm date after which the general contractor may pay its subcontractors without fear of further liability to the materialmen or suppliers of those contractors." Ramona, 755 F.3d at 1067 (citation and internal quotations omitted). The notice requirement is strictly enforced, such that failure to comply therewith "is fatal to a Miller Act claim." Id.

It is undisputed that, as a second-tier subcontractor, NWC is subject to the 90-day notice requirement. It is also undisputed that NWC "did not independently give notice pursuant to 40 U.S.C. § 3133 et seq." and instead relied on Bond claim letters sent by DeWitt on January 24, 2013, and August 2, 2013. Mohr Decl. Ex. 5, at 4; see also Mohr Decl. Ex. 3.[2] Furthermore, it is undisputed that, on August 29, 2012, and January 8, 2013, NWC and DeWitt, respectively, completed work on the Project. Hirte Decl. ¶ 14; Mohr

---

[2] The record before the Court contains numerous instances of duplication. Where evidence occurs in the record more than once, the Court will generally cite to the exhibits or declarations in which that information first appears.

Decl. Ex. 2. Therefore, summary judgment hinges on whether DeWitt's assignment excused NWC of the need to provide separate, independent notice under the Miller Act and, assuming that it did, whether DeWitt's notice was legally sufficient.

The Court finds that NWC's Miller Act claim fails in myriad respects. Initially, NWC has not cited to, and the Court is not aware of, any authority wherein a second-tier subcontractor sidestepped its own notice requirement under the Miller Act by obtaining an assignment from a subcontractor. See generally Pl.'s Resp. to Mot. Summ. J. In fact, neither the parties nor the Court were able to identify precedent governing the precise circumstances presented here. Nonetheless, in addressing an analogous issue, the Fourth Circuit held that a subcontractor's assignment to his second-tier subcontractor of his right to receive payment from the prime contractor, which was approved by the prime contractor, neither created a "contractual relationship, express or implied, between [the prime contractor and the second-tier subcontractor] within the meaning of the Miller Act which would dispense with the required 90-day notice," nor constituted notice from the second-tier subcontractor to the prime contractor under the former version of 40 U.S.C. § 3133(b)(2). U.S. ex rel. Henry Walke Co. v. Van de Riet, 316 F.2d 912, 915-16 (4th Cir. 1963). Extending this reasoning, the Court finds that the notice requirement is a condition precedent to recovery under the Miller Act irrespective

Page 9 - OPINION AND ORDER

of whether DeWitt assigned its financial rights to NWC.

This is not to say that a subcontractor's provision of notice on behalf of a second-tier subcontractor can never satisfy 40 U.S.C. § 3133(b)(2). Here, however, DeWitt's initial Bond notice referred only to "DeWitt['s] claim for labor, materials and equipment provided to Colamette on the Project." Morh Decl. Ex. 3, at 7. This notice did not use the word "subcontractor" or name NWC as the party seeking remittance against the Bond. Id. Thus, DeWitt's January 24, 2013, letter was inadequate because it failed to inform defendants that NWC was looking directly to Colamette for payment.[3] See U.S. for Use of San Joaquin Blocklite v. Lloyd E. Tull, Inc., 770 F.2d 862, 865 (9th Cir. 1985) ("[t]he written notice required by the statute must expressly or impliedly inform the general contractor that the [second-tier subcontractor] expects him to pay for labor or materials supplied to the subcontractor"); U.S. ex rel. Blue Circle W., Inc. v. Tucson Mech. Contracting Inc., 921 F.2d 911, 914 (9th Cir. 1990) ("'written notice' under the

_____

[3] The Court recognizes that DeWitt's August 2, 2013, notice clarifies that its Bond claim was made on account of "DeWitt and its subcontractors." Mohr Decl. Ex. 3, at 10-11. Nevertheless, this letter requests a significantly lesser amount, does not specifically name NWC as the party seeking payment against the Bond, and was furnished approximately seven months after DeWitt, and eleven months after NWC, completed work on the Project. Id.; see also U.S. ex rel. Alban Tractor Co., Inc. v. Hudson Ins. Co., 2013 WL 509151, *2 (D.Md. Feb. 11, 2013) (the "purpose [of the Miller Act] would be flouted by a judicial rule allowing claimants to file amended notices months or years after a project has been completed") (citation omitted).

Page 10 - OPINION AND ORDER

Miller Act 'must inform the prime contractor, expressly or by implication, that the [second-tier subcontractor] is looking to the contractor for payment'") (quoting Bowden v. U.S. for Use of Malloy, 239 F.2d 572, 577 (9th Cir. 1956), cert. denied, 353 U.S. 957 (1957)); see also U.S. ex rel. N.E.W. Interstate Concrete, Inc. v. EUI Corp., 93 F.Supp.2d 974, 978 (S.D.Ind. 2000) ("[t]he majority of courts considering the issue have found that . . . the notice must inform the general contractor (either expressly or by implication) that the [second-tier subcontractor] is looking directly to the general contractor for payment") (collecting cases).[4]

Accordingly, for notice to be effective in this context, it must inform the prime contractor that the second-tier subcontractor itself intends to bring a claim against a project's Miller Act bond. Essentially, NWC attempts to circumvent this requirement by

---

[4] NWC's brief is silent as to the majority of these authorities. To the extent it asserts that "[n]either of Blue Circle or Van de Riet is even remotely relevant" because those cases involved "letters regarding a possible claim for unpaid amounts," NWC's argument is unavailing. Pl.'s Resp. to Mot. Summ. J. 11-12. NWC's contention implies some meaningful legal distinction between the format of the notice letters sent here and those at issue in Blue Circle and Van de Riet. It is well-established, however, that "[s]ufficient notices have taken various forms." San Joaquin Blocklite, 770 F.2d at 865; see also U.S. for Use & Benefit of Water Works Supply Corp. v. George Hyman Const. Co., 131 F.3d 28, 32-34 (1st Cir. 1997) (liberally construing the requirements of 40 U.S.C. § 3133(b)(2) where the prime contractor possessed independent information regarding the claim against the bond from other oral and written communications with the second-tier subcontractor).

Page 11 - OPINION AND ORDER

relying on general principles of contract assignment. See Pl.'s Resp. to Mot. Summ. J. 9-10; but see Defs.' Reply to Mot. Summ. J. 4. Yet NWC's claim is not based on any work performed by DeWitt; it is limited only to the work and supplies it provided on the Project. See Mohr Decl. Ex. 2; Mohr Decl. Ex. 3, at 2; Mohr Decl. Ex. 4, at 3-4. Allowing NWC to bypass 40 U.S.C. § 3133(b)(2) and recover under DeWitt's name for the work that NWC performed on the Project would effectively destroy the Miller Act's distinction between subcontractors, who are exempt from the notice requirement, and second-tier subcontractors, as well as undermine the purpose of the statute. This is especially true in light of the fact that both of DeWitt's letters neglected to advise defendants that NWC was looking directly to Colamette for payment.

In any event, DeWitt's Bond claim letters were untimely in regard to NWC's work. The Miller Act explicitly states that notice must be furnished "within 90 days from the date on which the person did or performed the last of the labor or furnished or supplied the last of the material for which the claim is made." 40 U.S.C. § 3133(b)(2). When a second-tier subcontractor finishes its work on a project, the clock begins to run on the 90-day deadline. U.S. ex rel. Austin v. W. Elec. Co., 337 F.2d 568, 572-73 (9th Cir. 1964); see also AMEC Env't & Infrastructure, Inc. v. Structural Assocs., Inc., 2014 WL 1379519, *2 (E.D.N.C. Apr. 8, 2014) (second-tier subcontractor's argument that notice was sufficient because it was

provided "within ninety days of its completion of its work on the project as a whole . . . fails to recognize the statutory distinction between the notice requirement, which is to be provided within ninety days of last work performed <u>for which the claim is made</u>, and the limitations period . . . It is precisely this distinction that is intended to prevent general contractors from being exposed to stale claims of which they had no notice") (citation omitted and emphasis in original). NWC completed work on the Project by the end of August 2012 and the earliest notice pertaining to the Bond was DeWitt's January 24, 2013, letter. Because this letter was sent more than 140 days after NWC completed its Project work - i.e. "the labor . . . for which the claim is made" - it did not fulfill 40 U.S.C. § 3133(b)(2). Defendants' motion is granted as to NWC's Miller Act claim.

II.  <u>Quantum Meruit</u>

Quantum meruit, also known as unjust enrichment, is a quasi-contractual "obligation created by law without regard to the intention of the parties in situations in which one person is accountable to another on the grounds that otherwise he would unjustly benefit or the other would unjustly suffer loss." <u>DCIPA, LLC v. Lucile Slater Packard Children's Hosp. at Stanford</u>, 868 F.Supp.2d 1042, 1060-61 (D.Or. 2011) (citation omitted). Nonetheless, "if the parties have a valid contract, any remedies for breach flow from that contract, and a party cannot recover

quantum meruit for matters covered by the contract. <u>Ken Hood Const.</u> <u>Co. v. Pac. Coast Const., Inc.</u>, 203 Or.App. 768, 772, 126 P.3d 1254, <u>rev. denied</u>, 341 Or. 366, 143 P.3d 239 (2006).

Here, NWC's quantum meruit claim is fatally flawed because a valid and enforceable contract exists between DeWitt and NWC that governs the requested remedy. NWC subcontracted with DeWitt to "[f]urnish at its own cost and expense all labor, materials, tools, equipment and facilities necessary to do and fully complete the following described work: Installation of Soil Nail Shoring." Mohr Decl. Ex. 1, at 2, 9; Watt Decl. ¶ 2 & Ex. 1. The DeWitt/NWC agreement also set forth specific procedures, and corresponding remedies, for NWC to make additions to the second-tier subcontract price. Mohr Decl. Ex. 1, at 3-4, 7; <u>see also</u> Watt Decl. ¶ 4 & Ex. 6. Critically, NWC does not dispute the validity or enforceability of this contract, or the fact that it covers the relief sought via in this lawsuit.[5] <u>See generally</u> Pl.'s Resp. to Mot. Summ. J.; <u>see</u>

---

[5] For this reason, the precedent that NWC relies on, wherein the plaintiffs failed to file timely notice under the Miller Act but were allowed to obtain alternative quantum meruit relief because no valid and enforceable contract existed, are distinguishable. <u>See</u> Pl.'s Resp. to Mot. Summ. J. 13-14 (citing <u>Fid. & Deposit Co. of Md. v. Harris</u>, 360 F.2d 402, 407 (9th Cir. 1966); <u>U.S. ex rel. Sunworks Div. of Sun Collector Corp. v. Ins. Co. of N. Am.</u>, 695 F.2d 455, 457 (10th Cir. 1982)). Furthermore, the <u>Sunworks</u> court limited its holding to circumstances in which the property owner compensated the prime contractor in full for work performed by its subcontractors. <u>Sunworks</u>, 695 F.2d at 458. Here, however, Colamette did not receive compensation from the VA for NWC's Impact Costs. <u>See</u> Hirte Decl. ¶¶ 8-13; Thielbahr Decl. Ex. 1; <u>see also</u> Watt Decl. ¶¶ 3-7. There is no evidence in the record demonstrating that NWC furnished additional documentation of and support for its Impact Costs per Colamette's April 30,

also <u>Bojorquez v. Wells Fargo Bank, NA</u>, 2013 WL 6055258, *5 (D.Or.
Nov. 7, 2013) ("if a party fails to counter an argument that the
opposing party makes in a motion, the court may treat that argument
as conceded") (citations and internal quotations and brackets
omitted).

As a result, NWC cannot recover quantum meruit. See <u>Kashmir v.
Patterson</u>, 289 Or. 589, 592-94, 616 P.2d 468 (1980) (while "a
plaintiff may plead alternatively on an express contract and in
quantum meruit," once the parties concede the existence of a valid
and enforceable agreement, an alternate claim for quantum meruit
must be stricken); <u>see also Undersea Eng'g & Constr. Co. v. Int'l
Tel. & Tel. Corp.</u>, 429 F.2d 543, 552 (9th Cir. 1970), <u>overruled in
part on other grounds by Avery v. United States</u>, 829 F.2d 817 (9th
Cir. 1987) ("a sub-subcontractor who is not paid by the
subcontractor for whom the 'sub-sub' has, under contract, rendered
work and labor has no claim in quasi-contract, or equity against
the prime contractor with whom the 'sub-sub' had no contractual
dealings whatsoever"). Defendants' motion is granted as to NWC's

---

2012, instructions. Rather, in May 15, 2012, NWC sent DeWitt a
correspondence outlining its Installation and Impact Costs;
regarding the latter, NWC merely referred to its December 29,
2011, proposal, which Colamette and the VA previously rejected
because, amongst other reasons, it was "not properly formatted
and did not provide proper justification." Hirte Decl. Ex. 4;
Watt Decl. ¶ 6 & Ex. 4. Accordingly, in revising its submission
to Colamette and, by extension, the VA, DeWitt included only
NWC's previously accepted Installation Costs. Thielbahr Decl. Ex.
1, at 18. As a result, no benefit was conferred on Colamette,
which is a requisite element of a quantum meruit claim. <u>DCIPA</u>,
868 F.Supp.2d at 1061.

quantum meruit claim.

III. Breach of Contract

Where the assignment of a valid contract occurs, "[a]n assignee stands in the shoes of the assignor and acquires no greater interest than the assignor possessed." Commonwealth Elec. Co. v. Fireman's Fund Ins. Co., 93 Or.App. 435, 438, 762 P.2d 1041 (1988). The assignee is therefore subject to any contract-based defenses that a third-party could assert against the assignor.

NWC was assigned DeWitt's rights under the DeWitt/Colamette contract, and it is those rights that NWC is now attempting to enforce. See Compl. ¶¶ 4.1-4.4; Mohr Decl. Exs. 3-4. Yet DeWitt's assignment to NWC of its right to receive payment from Colamette is in direct contravention of the DeWitt/Colamette agreement. Namely, section 8.11 precludes DeWitt from "assign[ing] any money due or to become due under this Agreement, without the written consent of [Colamette], unless the assignment is intended to create a new security interest within the scope of Article 9 of the [UCC]." Hirte Decl. Ex. 1, at 19. It is undisputed that Colamette never provided DeWitt with written consent to assign its right to the proceeds from the Project subcontract to NWC. Hirte Decl. ¶ 16; Mohr Decl. Ex. 5, at 2-3. Accordingly, NWC's breach of contract claim against Colamette is only cognizable if DeWitt's February 2014 RMOU created a valid security interest under Article 9 of the

UCC.[6] See Folquet v. Woodburn Sch., 146 Or. 339, 341-42, 29 P.2d 554 (1934) (contracts containing "a stipulation against assignment [come] within the exception to the general rule and [are] not assignable").

The Court finds that NWC's attempt to recast DeWitt's assignment as an Article 9 security interest is ineffective. As defendants observe, "[a] security interest in personal property is like a mortgage on real property . . . a borrower gives a lender a UCC Article 9 security interest in assets or accounts as security for the debt to ensure that the money loaned gets repaid, which allows the borrower to retain the assets, with the lender's security interest noted in public records." Defs.' Mem. in Supp. of Mot. Summ. J. 12; see also Filer, Inc. v. Staples, Inc., 766 F.Supp.2d 314, 317 (D.Mass. 2011) ("Article 9 of the UCC applies to secured transactions (obligations the payment of which is guaranteed by the borrower's pledge of collateral)") (citation and internal quotations omitted). Unlike a security interest, an assignment completely transfers the interest of the assignor to the assignee. Commonwealth Elec., 93 Or.App. at 438. Thus, "[t]he assignment of an account or a payment intangible escapes the clutches of Revised Article 9 if it is made to an 'assignee in full or partial satisfaction of a pre-existing indebtedness.'" In re

_____

[6] NWC does not argue, and the Court does not find, that DeWitt's first assignment, dated August 22, 2013, created a Article 9 security interest. See generally Pl.'s Resp. to Mot. Summ. J.; Mohr Decl. Ex. 3.

Page 17 - OPINION AND ORDER

Cohen, 305 B.R. 886, 903 (9th Cir. B.A.P. 2004) (quoting Or. Rev. Stat. § 79.0109(4)(g)). These types of assignments were excluded from the scope of Article 9 because, "by their nature, [they] do not concern commercial financing transactions." U.C.C. § 9-109, Official Comment 12.

As noted above, NWC has no direct contractual relationship with Colamette, such that its right to payment is governed by its second-tier subcontract with DeWitt. Under the RMOU, if successful in this litigation, NWC would keep all damages collected from defendants and would credit the money collected as full or partial satisfaction for any outstanding amounts owed by DeWitt to NWC for its Project work. Mohr Decl. Ex. 4, at 2. As such, the RMOU contains no terms relating to commercial financing or creating a security interest in DeWitt's right to payment, in part because NWC has offered nothing in the way of collateral. See generally id.; see also Or. Rev. Stat. § 71.2010(2)(ii) (defining a security interest as "an interest in personal property or fixtures which secures payment or performance of an obligation"). In sum, the RMOU effectuated a straightforward transfer from DeWitt to NWC of money due or owing under the DeWitt/Colamette contract, such that it falls outside of the purview of Article 9 of the UCC. See Filer, 766 F.Supp.2d at 315-17 (assignment made under analogous circumstances was "not subject to Article 9"). Indeed, if, as NWC contends, "[n]o preexisting debt exists in this case" - i.e. if DeWitt fully remunerated all money owed to NWC for the work and

Page 18 - OPINION AND ORDER

materials it contributed to the Project - then this lawsuit serves no purpose. Pl.'s Resp. to Mot. Summ. J. 15. Colamette's motion is granted as to NWC's breach of contract claim.

Accordingly, the Court declines to address Colamette's arguments concerning whether DeWitt's execution of progress payment waivers during the relevant time period foreclosed NWC's right to bring suit, especially because the parties have not cited to, and the Court is not aware of, any on-point Oregon or Ninth Circuit precedent concerning this issue. See Pl.'s Resp. to Mot. Summ. J. 16-17; Defs.' Reply to Mot. Summ. J. 9-11.

## CONCLUSION

Defendants' motion for summary judgment (doc. 25) is GRANTED. Defendants' request for oral argument is DENIED as unnecessary and this case is DISMISSED.  All pending motions are denied as moot.

IT IS SO ORDERED.

Dated this ___ day of October 2014.


_____
Ann Aiken
United States District Judge